IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JASON GREENWAY, ) <br> as Administrator ad Litem for the Estate of ) <br> George Dwayne Greenway ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> TERRENCE LEVECK, and TRULENER ) <br> WALTER, ) <br> ) <br> Defendants. ) | NO. 3:20-cv-00058 <br> JUDGE RICHARDSON |

## MEMORANDUM OPINION[1]

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. No. 45, "Motion"), which is supported by a memorandum of law. (Doc. No. 46). Plaintiff filed a Response in Opposition (Doc. No. 59, "Response"), and Defendants filed a Reply in Support of their Motion. (Doc. No. 62). The matter is ripe for review. For the reasons discussed herein, the Motion will be granted in part and denied in part.

## BACKGROUND[2]

George Dwayne Greenway ("Decedent") was, at all relevant times, an inmate at Trousdale Turner Correctional Center ("TTCC") in Hartsville, Tennessee. (Doc. No. 24 at 1). Defendant

---

[1] The Court notes that many of the documents in this case were filed, and remain, under seal. The sealing of any such document shall be deemed lifted by virtue of this memorandum opinion only to the extent that particular information in the document has been referred to herein.

[2] The facts in this section are taken from the Amended Complaint (Doc. No. 24) and Plaintiff's "Additional Statement of Material Facts." (Doc. No. 61 at 8-15). The facts taken from the Amended Complaint are also included in the Factual Background of Defendants' Memorandum in Support of the Motion for Summary

Trulener Walter was a nurse practitioner at TTCC, and Defendant Terrence Leveck was a doctor at TTCC. (*Id.* at 1-2).

Decedent first became incarcerated at TTCC in April 2018. (*Id.* at 2). On May 4, 2018, after complaining of neck pain, Defendant Walter prescribed nortriptyline[3] for Decedent in a dosage of 200 milligrams (mg) a day. (Doc. No. 61 at 8). In July 2018, Decedent began complaining of seizures, but no immediate action was taken. (*Id.* at 9). At this point, Decedent was suffering from Hepatitis C and liver disease, as well as a seizure disorder. (*Id.* at 9-10). He was also taking Dilantin for his seizure disorder (Doc. No. 24 at 3), which he had been prescribed in April 2018 upon his incarceration at TTCC. (Doc. No. 46 at 3).

On October 29, 2018, Dr. Leveck referred Decedent for emergency outside medical care at Nashville General Hospital, where he was found to have Dilantin toxicity and urinary retention.[4] (Doc. No. 61 at 10). In response, Keppra was substituted for Dilantin as treatment for Decedent's seizures. (*Id.*). On January 25, 2019, Decedent complained that he had not received his prescribed Keppra for five (5) days and had suffered a seizure that day. (*Id.* at 11). The same day, Decedent was evaluated by Defendant Walter who counseled him on "pseudo seizures" but also ordered a doubled dose of Keppra, but without checking to ensure it was available. (*Id.*). Decedent remained at TTCC for two more hours until he had another seizure that lasted 45 minutes. (*Id.*). At that point, Decedent was transported via emergency medical personnel to Sumner Regional Medical Center where he had an additional two seizures. (*Id.* at 12). Decedent returned to TTCC on January 28,

---

Judgment (Doc. No. 46 at 2-8), so they do not appear to be disputed. Moreover, Defendants did not respond to Plaintiff's "Additional Statement of Material Facts"; thus, pursuant to Local Rule 56.01(f), the Court will take those facts as undisputed.

[3] Nortriptyline is a tricyclic antidepressant; it also has a secondary use for neurological pain. (Doc. No. 61 at 8).

[4] Urinary retention can be a sign of nortriptyline toxicity. (Doc. No. 61 at 10).

2019 after resuming Keppra. (*Id.*). Sumner Regional Hospital staff also lowered Decedent's nortriptyline dosage to 100mg a day, instead of 200mg. (*Id.*). Defendants ignored this change and resumed 200mg a day upon Decedent's return to TTCC. (*Id.*). On February 17, 2019, Decedent suffered another seizure and was found unresponsive in his cell. (*Id.*). He was treated with Narcan, and life-saving measures were taken, but he was pronounced dead after being transported to Trousdale Medical Center. (*Id.* at 12-13). Decedent's autopsy noted his cause of death as "acute combined drug toxicity" caused by nortriptyline, venlafaxine, and methadone. (*Id.* at 13). In his system, nortriptyline was found at a toxic level of 1,200ng/ml, venlafaxine at an "elevated" level of 490 ng/ml; and methadone at 88 ng/ml.[5] (*Id.*).

Plaintiff, appointed the Administrator ad Litem of the Estate of Decedent on January 13, 2020, filed the present action on January 21, 2020, and thereafter filed an Amended Complaint. (Doc. No. 24). Though the Amended Complaint is not exceedingly clear as to what claims Plaintiff intends to assert, the Court is confident (after reviewing Defendants' Motion for Summary Judgment and Plaintiff's Response) that Plaintiff is bringing two claims, each under 42 U.S.C. § 1983, based on Defendants' alleged deliberate indifference (to Decedent's medical circumstances) in violation of the Eighth Amendment. (*Id.* at 6). The first claim appears to be based on Defendants' failure to provide the Decedent with the seizure medication Keppra and for failing to provide treatment when Decedent began having seizures after not having access to Keppra for five days. The second claim is based on Defendants' prescription and provision of nortriptyline to Decedent and his ultimate death from "acute drug toxicity." (Doc. No. 61 at 13).

---

[5] Ng/ml refers to nanograms per milliliter.

# STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628.

A party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary

judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, No. 15-4292, 2017 WL 57792 at *5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

## DISCUSSION

Defendants seek summary judgment on both of Plaintiff's claims. As indicated above, each claim is brought under 42 U.S.C. § 1983 based on particular circumstances (different for each count) allegedly reflecting injuries to Decedent resulting from Defendants' deliberate indifference

in violation of the Eighth Amendment.[6] "To state a civil rights claim under 42 U.S.C. § 1983, a plaintiff must allege (1) the violation of a right secured by the U.S. Constitution or federal law; and (2) that the right was violated by a person acting under color of state law." *Jebril v. Webber*, No. 08-10151, 2009 WL 2447551, at *2 (E.D. Mich. Aug. 7, 2009) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). As noted, Plaintiff is alleging a violation of the Eighth Amendment, which "protects an inmate from cruel and unusual punishments, [and] includes a right to be free from deliberate indifference to an inmate's serious medical needs." *Brawner v. Scott Cnty, Tenn.*, 14 F.4th 585, 591 (6th Cir. 2021) (citing *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018)).[7]

To state a cognizable claim for deliberate indifference under the Eighth Amendment, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.* (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (noting that the criteria for cruel and unusual punishment under the

---

[6] If the law of the forum state so allows, a "decedent's civil rights claim, a personal cause of action, may be pursued in the name of the decedent's personal representative." *Jaco v. Bloechle*, 739 F.2d. 239, 245 (6th Cir. 1984). "Tennessee law provides that the survival of action passes to the 'person's surviving spouse and, in case there is no surviving spouse, to the person's children or next of kin; to the person's personal representative, for the benefit of the person's surviving spouse or next of kin.'" *Davis v. Memphis Police Dep't*, No. 13-2497-JDT-DKV, 2013 WL 4446240, at *5 (W.D. Tenn. Aug. 15, 2013) (quoting Tenn. Code. Ann. § 20-5-106). Here, Decedent's rights passed to Plaintiff as Administrator ad Litem of Decedent's estate. (Doc. No. 24 at 1).

[7] The Eighth Amendment protects inmates serving sentences of imprisonment after conviction, as Decedent was. *See Richmond*, 885 F.3d at 937 ("The Eighth Amendment provides an inmate the right to be free from cruel and unusual punishment."). In the case of state actors like Defendants, Eighth Amendment protections are applicable (when they are applicable) specifically by way of the Fourteenth Amendment. *See Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). In these situations, courts generally speak in terms of "Eighth Amendment" protection without any reference (beyond an initial reference) to the Fourteenth Amendment. Eighth Amendment protection is applicable in the instant case.

By contrast, the Due Process Clause of the Fourteenth Amendment provides the same kind (though not always identical) protection to pretrial detainees. *Richmond*, 885 F.3d at 937 ("The Due Process Clause of the Fourteenth Amendment provides the same protections to pretrial detainees."). Such protection is generally referred to by courts as "Fourteenth Amendment" protection without any reference (beyond an initial reference) to the Due Process Clause. Fourteenth Amendment protection is inapplicable here.

Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.")). Additionally, the Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Generally, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

> As this Court has previously noted
>
> A claim of deliberate indifference to a prisoner's medical needs under the Eighth Amendment has both an objective and subjective component. *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014). A plaintiff satisfies the objective component by alleging that the prisoner had a medical need that was "sufficiently serious." *Id.* (quoting *Farmer*, 511 U.S. at 834). A plaintiff satisfies the subjective component "by alleging facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.*

*Hill v. Wilkins*, No. 3:19-cv-00785, 2019 WL 4644235, at *2 (M.D. Tenn. Sept. 24, 2019). *Accord Brawner*, 14 F.4th at 591.[8] The subjective component "requires an inmate to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.'" *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). This

---

[8] It is worth noting, albeit as an aside, that a claim of deliberate indifference under the *Fourteenth Amendment* now has, in the Sixth Circuit at least, a different test for the subjective component. Without unnecessarily getting into the details here, suffice it to say that, since late 2021, "the second prong of the deliberate indifference test [the subjective component] applied to pretrial detainees . . . require[s] only recklessness." *See Greene v. Crawford Cty., Mich.*, No. 20-1715, 2022 WL 34785, at *8 (6th Cir. Jan. 4, 2022) (citing *Brawner,* 14 F.4th at 597). As *Greene* explains, the recognition of this change in the law was some time in the making, and recent scholarship has noted presciently the potential and need for this kind of revisiting of whether any (and, if so, what) subjective component, in addition to an objective component, should be required for Fourteenth Amendment claims. *See* Kate Lambroza, *Pretrial Detainees and the Objective Standard After Kingsley v. Hendrickson*, 58 AM. CRIM. L. REV. 429 (2021).

means "a mental state 'equivalent to criminal recklessness.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013)).

I.      **Plaintiff's Eighth Amendment Claim Related to the Non-Provision of Keppra**

Defendants move for summary judgment on the basis that Defendants are "not responsible for providing or for facilitating the provision of Keppra" to Decedent. (Doc. No. 46 at 8). Defendants' entire argument rests on two items of evidence: a statement from Defendant Leveck's declaration and a statement from Defendant Walter's declaration. Defendant Leveck's declaration states in pertinent part:

> I was not responsible for any failure to stock Keppra. I was not responsible for ordering medications for the facility pharmacy, making sure that medications were stocked in the facility pharmacy, or giving medications from the facility pharmacy to the inmates. I did not oversee or supervise others who were responsible for these tasks at Trousdale. And, I had not been made aware that the facility pharmacy ran out of Keppra and thus could not possibly have known that Greenway went without the medication.

(Doc. No. 49 ¶ 6). And the statement from Defendant Walter's declaration says,

> I was not responsible for any failure to stock Keppra. I was not responsible for ordering medications for the facility pharmacy, making sure that medications were stocked in the facility pharmacy, or giving medications from the facility pharmacy to the inmates. I did not oversee or supervise others who were responsible for these tasks at Trousdale. And, I had not been made aware that the facility pharmacy ran out of Keppra and thus could not possibly have known that Greenway went without the medication. Once Greenway told me that he had been without his Keppra, I ordered the medication and then ordered his immediate transport to an offsite hospital.

(Doc. No. 52 ¶ 4).

Defendants appear to be challenging Plaintiff's ability to prove the subjective component of a claim for deliberate indifference by arguing that neither Defendant had any responsibility in

regard to Decedent's access to Keppra.[9] Responsibility for the conduct at issue is not an explicit element of an Eighth Amendment deliberate-indifference claim in the Sixth Circuit, but the case law suggests it is nonetheless a requirement. *See Lewis v. Phillips*, No. 20-5432, 2020 WL 6277422, at *3 (6th Cir. Oct. 19, 2020) (holding a plaintiff failed to plead deliberate indifference when he pleaded no facts to show that defendant "was personally responsible for his treatment or that she knew or should have known her staff was not following his treatment plan"); *Richmond v. Huq*, 885 F.3d 928, 941 (6th Cir. 2018) (finding that a doctor was not liable for deliberate indifference when he had no responsibility to implement a course of treatment on an incarcerated plaintiff, nor was there evidence that he was ever aware said treatment was not being implemented); *Edmonds v. Rees*, No. 3:06-CV-P301-H, 2008 WL 3820428, at *4 (W.D. Ky. Aug. 13, 2008) ("As such, [defendant's] actions or inactions are not responsible for Plaintiff's alleged Eighth Amendment violation . . . [t]he Court therefore finds that [defendant] is entitled to summary judgment in her favor . . . "); *Washington v. Reed*, No. 05-CV-72433, 2007 WL 2029503, at *2 (E.D. Mich. July 9, 2007) ("Plaintiff has failed to provide any Supreme Court or Sixth Circuit authority that supports the proposition that deliberate-indifference claims can be brought against defendants who are not responsible for the conditions of Plaintiff's confinement or for Plaintiff's health and safety while incarcerated."). In the cases where the responsibility (or lack thereof) of defendants is discussed, the requirement appears to be evaluated in connection with the subjective

---

[9] Defendants' Motion does not challenge the objective component of Plaintiff's deliberate-indifference claim. Such a challenge would likely have been unsuccessful, as the case law in the Sixth Circuit is clear that a seizure disorder is a serious medical concern. *See Parsons v. Caruso*, 491 F. App'x. 597, 601 (6th Cir. 2012) ("The defendants do not contest that Parsons had a sufficiently serious medical need-he suffered from a seizure disorder.").

component of deliberate indifference.[10] Because Defendants are challenging whether there is sufficient evidence to allow a jury to find that they had a responsibility to ensure that Decedent had access to Keppra, they are thus challenging the subjective component of deliberate indifference and asking whether there is sufficient evidence to prove that Defendants knew of and disregarded "an excessive risk" to Decedent's health and safety when he lost access to Keppra and they failed to take action. *Brawner*, 14 F.4th at 591 (quotations omitted).

First, the Court must determine whether Defendants identified portions of the record that demonstrate (preliminarily) an absence of a genuine dispute as to material facts, and thus shifted the burden to Plaintiff. *See Pittman*, 901 F.3d at 627. The Court concludes that Defendants successfully did so. Defendants point to their own declarations, whereby they attest to having no responsibility to monitor the stock of Keppra in the TTCC pharmacy and no responsibility related to the TTCC pharmacy's provision of medications to inmates.[11] If Defendants indeed had no

---

[10] For an example of this, see *Richmond*, 885 F. 3d at 939, where prior to discussing the responsibilities of certain defendants toward plaintiff's medical care, the Sixth Circuit writes "[w]ith these standards in mind, we turn to the subjective culpability of the Jail Defendants who were responsible for treating Richmond during her confinement." *See also Walker v. Eyke*, 417 F. App'x 461, 464 (6th Cir. 2011) (finding that a plaintiff could not prove the subjective component of deliberate indifference in regard to a psychologist for failing to prescribe medication because the psychologist had "no authority to prescribe the [] drugs requested."); *Bradley v. City of Ferndale*, 148 F. App'x 499, 510 (6th Cir. 2005) (noting that "[b]ecause the plaintiff has failed to produce any evidence suggesting that [defendant] was responsible for checking on [plaintiff], it cannot be said that his failure to do so constituted a conscious disregard of [plaintiff's] suicidal tendencies.").

[11] The Court concludes that the term "responsibility" in Defendants' declarations is fairly construed to mean something like "job responsibility" or "employer-assigned duty," which can be treated as a *factual assertion*. In particular, it can be treated as an assertion that as a factual matter, the respective Defendants' job responsibilities—employer-assigned duties—did not encompass the specific activities implicated by Plaintiff's first claim. This is important because the Court construes the case law, when indicating that a defendant is not liable unless the defendant had "responsibility," as referring to the defendant having *job responsibilities* or *employer-assigned duties* with respect to the activity at issue.
    Were Defendants to be referencing their "responsibility" in the moral or legal sense of the word, the Court likely would have had to find Defendants' assertion of a lack of "responsibility" too conclusory—and perhaps not even relevant to the precise relevant *factual* question at issue here—and thus insufficient to indicate a lack of genuine dispute as to material facts concerning whether they can be held individually liable under the law.

responsibility related to the Decedent's access to Keppra, then that would suggest an absence of a genuine dispute as to whether Defendants were aware of a risk to Decedent related to his access to Keppra and then deliberately ignored that risk. So the question is whether Plaintiff meets his resulting burden.

In response, Plaintiff argues that it was Defendants' responsibility to monitor Decedent's "anti-seizure medication . . . to ensure he was receiving his prescribed medication so as to prevent seizures." (Doc No. 59 at 12). To illustrate this argument as to Defendant Leveck, Plaintiff points both to an acknowledgement by Defendant Leveck that individuals in jail are reliant on medical staff to provide for their needs (Doc. No. 60-9 at 26), and to the fact that Defendant Leveck was the medical director of TTCC, and his duties included managing the infirmary and monitoring medication levels in patients. (*Id.* at 2-3).

As to Defendant Walter, Plaintiff notes that she knew Keppra was an important drug. Plaintiff points to Walter's deposition where she said "[y]ou've got to be very careful with [Keppra]" to ensure that it is in the therapeutic range. (Doc. No. 60-10 at 11). Defendant Walter also knew that Decedent had been without Keppra for five days and that he had suffered a seizure that day (January 25, 2019). (Doc. No. 61 at 11). Nonetheless, Decedent remained at TTCC without Keppra until he suffered an additional seizure. (Doc. No. 60-20 at 4). Plaintiff notes that TTCC has an on-site pharmacy and that there are two off-site pharmacies accessible to TTCC staff if certain medications are not available in the on-site pharmacy. (Doc. No. 60-9 at 6-8). ). Finally, Plaintiff argues that Defendant Walter had the authority to transport Decedent to an outside facility immediately after she found out he had not had Keppra and had experienced a seizure but did not do so until Decedent suffered another seizure. To support this argument, Plaintiff cites to the Decedent's medical paperwork from January 25, 2019, which shows Walter's signature under a

note for "start Keppra" around 2:40 p.m. that day, as well as her signature under another note around 4:30 p.m. sending Decedent off-site for an evaluation. (Doc. No. 60-6 at 4).

To satisfy the subjective component of deliberate indifference, Plaintiff must show that Defendants were aware that a substantial risk of serious harm existed and failed to act. *See Blackmore*, 390 F.3d at 896. As discussed above, Plaintiff must also show that Defendants were responsible, in some capacity, for the circumstances and events leading to his Eighth Amendment claim. One Sixth Circuit case is particularly helpful in evaluating how the requirement of responsibility interrelates with the subjective component of deliberate indifference. In *Richmond,* the Sixth Circuit considered which nurses could be found to be responsible for a burn on an inmate not properly healing. 885 F.3d 928. The court determined that two nurses could not be considered deliberately indifferent for ignoring wound cleaning because they acted within "their limited role of preparing [plaintiff] for her scheduled examinations with the *responsible* medical party." *Id.* at 945 (emphasis added). On the other hand, the court in *Richmond* found that two other nurses could, in fact, be found liable because evidence existed to suggest (1) the nurses knew plaintiff needed daily wound dressing changes to ensure proper healing of her burn, (2) they knew the dressing changes were not being consistently provided to plaintiff, (3) it was within their employment responsibilities to provide dressing changes to plaintiff, and (4) they still did nothing. *Id.* The Sixth Circuit held that the failure to act constituted a conscious disregard of a serious risk by the latter two nurses. *Id.* In another case with a similar factual background to the present action, the Sixth Circuit held that a nurse conducting intake of inmates could be found liable for a deliberate-indifference claim when she noted that an incoming inmate had not received his anti-seizure medication, and could have taken action to provide him with such medication, but instead made "a conscious choice to let [plaintiff] linger yet longer without his anti-seizure medication." *Parsons v. Caruso*, 491 F. App'x. 597, 604-5 (6th Cir. 2012) ("Viewing the facts and drawing all reasonable inferences in favor of

[plaintiff], [defendant's] failure to administer Dilantin, even if she lacked intent or knowledge that harm would actually result, would exceed negligence and rise to the level of "recklessness" as required under the deliberate indifference standard.").

In the present action, Plaintiff has not pointed to sufficient facts to show there is a genuine dispute as to whether Defendant Leveck was deliberately indifferent with respect to Decedent's Keppra prescription. Plaintiff pointed to no facts to establish Defendant Leveck's responsibility in regard to Decedent's access to Keppra. While Plaintiff noted that Defendant Leveck was the medical director of TTCC and generally had a duty to monitor some specific medications in inmates (Doc. No. 60-9 at 2-3), this is not sufficient to show a responsibility to monitor Keppra levels in Decedent. *See Richmond*, 885 F.3d at 941 (finding summary judgment appropriate when it was not the doctor's "role to implement the course of treatment, and there are no facts in the record to suggest that [the doctor] was ever aware that the treatment was not being implemented as he prescribed.").

The Court grants that perhaps Defendant Leveck (especially considering the relatively high-ranking position he occupied) would have become responsible for this issue if Decedent's lack of access to Keppra had been brought to his attention sooner than it was (in which case his job duties well might have encompassed ensuring that the *someone* did something about the problem). But whether he would have become responsible under such circumstances is immaterial here because Plaintiff has shown no evidence to suggest that Defendant Leveck was aware that Decedent had gone without Keppra for five days or that Decedent had suffered the initial seizure on January 25, 2019. In fact, Plaintiff himself points to Defendant Leveck's testimony that suggests a distinct lack of knowledge. In the cited testimony, Defendant Leveck states he was called *after* Decedent had a second seizure and at that time was informed that there was no Keppra on-site. (Doc. No. 60-9 at 18). Defendant Leveck also notes that he was not aware of how long the

pharmacy had been out of Keppra by that point. (*Id.*). These are not sufficient facts to show a genuine dispute as to whether Defendant Leveck "subjectively perceived facts from which to infer substantial risk to the [Decedent], that he did in fact draw the inference, and that he then disregarded that risk." *Rouster*, 749 F.3d at 446 (quoting *Comstack*, 273 F.3d at 703).

On the other hand, the Court finds that Plaintiff has raised a genuine dispute of material fact regarding Defendant Walter's subjective state of mind. To begin with, the Court notes that Defendants' attack on the subjective component as it relates to Defendant Walter is limited to a challenge to the notion that Defendant Walter had responsibility here. It is undisputed that on January 25, 2019, Decedent told Defendant Walter he had not been receiving Keppra and had experienced a seizure. (Doc. Nos. 46 at 3 and 61 at 11). Plaintiff cites evidence showing that Defendant Walter did not acquire Keppra for Decedent, and that instead Decedent remained at TTCC for two more hours, until he experienced another seizure. (Doc. No. 60-20 at 4). At that point, Defendant Walter ordered his transfer to another facility. (Doc. No. 60-6 at 4). Plaintiff notes that during Defendant Walter's deposition, she was asked whether Decedent could have been transferred to another facility earlier in the day where he could have received Keppra, and that Defendant Walter answered that that decision would have been up to the "person that was assessing him on that day." (Doc. No. 60-10 at 23). It is unclear whether Defendant Walter was the person "assessing" Decedent on January 25, 2019, but her name and signature are on his medical orders from that day. (Doc. No. 60-6 at 4). These are sufficient facts by which a jury could determine that Defendant Walter in fact had the necessary *responsibility* with respect to the activities here at issue (the provision of such medication to Decedent). This defeats Defendants' sole argument concerning the claim against Defendant Walter.

Moreover, even if Defendants had made a broader attack on the subjective component as it relates to Defendant Walter—*i.e.*, had argued that the subjective component was absent *even if*

Defendant Walter had the relevant responsibility—the attack would have failed. The undisputed facts (and evidence related to what may be disputed facts) set forth in the prior paragraph are sufficient to support a finding that Walter (1) knew there was a substantial risk to Decedent in not receiving his seizure medication for five days, and (2) did not take steps to ensure Decedent could quickly receive Keppra, even after he reported experiencing a seizure.

Accordingly, Defendants' Motion, as it relates to the non-provision of Keppra to Decedent, will be granted as to Defendant Leveck, but denied as to Defendant Walter.

## II. Plaintiff's Eighth Amendment Claim Related to Defendants' Prescription of Nortriptyline

Defendants additionally move for summary judgment on Plaintiff's other claim, this one (another) Eighth Amendment deliberate-indifference claim based in Decedent's nortriptyline prescription and ultimate death allegedly caused thereby. Defendants argue that Plaintiff cannot show that Defendants' daily provision of 200mg nortriptyline to Decedent proximately caused his death.[12] (Doc. No. 46 at 10-11). "Proximate cause is an essential element of a § 1983 claim for damages." *Horn by Parks v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 659 (6th Cir. 1994) (quoting *Doe v. Sullivan County, Tennessee*, 956 F.2d 545, 550 (6th Cir. 1992)).

To illustrate there is no genuine dispute as to whether nortriptyline was a proximate cause of Decedent's death, Defendants point to a report from their retained expert, Dr. Christopher P.

---

[12] It appears from the memorandum of law in support of the Motion that Defendants are challenging Plaintiff's nortriptyline Eighth Amendment deliberate-indifference claim only with respect to proximate causation. (Doc. No. 46 at 10-15). The Court perceives that the claim conceivably could have been challenged on the basis that the Amended Complaint alleges facts that seem to suggest inadequate medical care rather than no medical care. *See Comstock*, 273 F.3d at 70 ("When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation."). However, the Court will forgo addressing any such basis because Defendants never made any such challenge and because their memorandum of law references only an alleged lack of proximate causation as the basis for their challenge to Plaintiff's second claim.

Holstege, a licensed physician in Charlottesville, Virginia. (Doc. No. 48-1). In his report, Dr. Holstege notes that the "classic" symptoms of nortriptyline toxicity were not witnessed in the Decedent during the time he was prescribed nortriptyline. (*Id.* at 10). Additionally, Dr. Holstege's report notes that Decedent's forensic blood analysis showed "numerous drugs that were prescribed to him, are potentially deadly, and can interact with his prescribed medications to cause adverse complications." (*Id.* at 12). Finally, Dr. Holstege's report notes that, "Mr. Greenway's death was caused by a number of drugs that were not prescribed to him but found on post-mortem forensic analysis. His death was not caused by the prescribing physicians." (*Id.* at 13). Defendants also cite to a report by a second retained expert, Dr. Kevin S. McKechnie, who is a licensed physician in Nashville, Tennessee. (Doc. No. 50-1 at 1). Dr. McKechnie's report states that Decedent's "decision to take Methadone tragically caused his death" and "[b]eing on nortriptyline for over 9 months did not cause Greenway's death. His choice to use Methadone did." (*Id.* at 4, 6).

The Court believes that by pointing to these statements of their experts, Defendants successfully pointed to evidence suggesting preliminarily that there is no genuine dispute as to whether the 200mg daily prescription of nortriptyline caused (proximately or otherwise) Decedent's death. A lack of evidence supporting proximate causation would be fatal to Plaintiff's claims, as proximate causation is a requirement of § 1983 claims for damages, including those predicated on the Eighth Amendment. *See Warrick v. Walker*, No. CIV.A. 304-0221, 2006 WL 140720, at *5 (M.D. Tenn. Jan. 17, 2006). "An injury is proximately caused by an act when it appears from the evidence in the case that the defendant's conduct was a substantial factor in bringing about the plaintiff's harm, and no rule of law relieves the defendant from liability because of the manner in which his conduct resulted in the harm." *Id.* (quoting *Hickerson v. Koepp*, Nos.95-1890, 95-1982, 1997 WL 56961, at *3 (6th Cir. Feb.10, 1997)). Defendants' expert's statements

suggest (subject to Plaintiff's rebuttal, of course) that Plaintiff would be unable to show such proximate causation.

In response, Plaintiff argues that Decedent was exhibiting signs of nortriptyline toxicity prior to his death. Plaintiff points to evidence that Decedent's liver condition worsened over the eight months he was taking nortriptyline, and that he also exhibited urinary retention, memory issues, stuttering, and breakthrough seizures, which are known issues with nortriptyline. (Doc. No. 60-12 at 9-10, 17). When Decedent went to the hospital in November of 2018, his discharge summary lists "retention of urine" and "altered mental status" as symptoms he was experiencing. (Doc. No. 60-15). Moreover, Plaintiff points to evidence that Decedent was suffering from Hepatitis C and liver cirrhosis, which can impact the liver's ability to metabolize nortriptyline. (Doc. No. 60-11 at 6, 8, 9). And Decedent was prescribed the medications sertraline and haloperidol, which also inhibit the liver's metabolization abilities. (Doc. Nos. 60-11 at 6, 60-12 at 5, 9-10).

Plaintiff also argues that the record supports the idea that nortriptyline toxicity was "a substantial factor in [Decedent's] death." (Doc. No. 59 at 19). To support this argument, Plaintiff cites to Defendant Leveck's deposition, which notes that the dosage of nortriptyline Decedent was receiving would have resulted in a blood level of around 300 nanograms per ML (Doc. No. 60-9 at 24), and to the post-mortem toxicology report which states that, "At plasma levels exceeding 200 ng/mL [of nortriptyline], toxic side effects such as hyper- or hypotension, tachycardia, cardiac arrhythmia, confusion and nausea may be present; severe overdose may result in convulsions, coma and cardiac irregularities." (Doc. No. 60-3 at 5-6). Plaintiff also points to the medical examiner's report of Decedent's body, which lists his cause of death as "acute combined drug toxicity (methadone, nortriptyline and venlafaxine)" and notes that he had "toxic concentrations

of nortriptyline." (Doc. No. 60-2 at 7). Finally, Plaintiff cites to his own retained expert, Dr. Timothy Allen, a board-certified psychiatrist.[13] (Doc. No. 60-13 at 5). Dr. Allen states in his deposition

> I think the greatest offender and the most likely direct cause [of death] is the nortriptyline. It was the one with the highest blood level. It was the one that has — that is well known to cause cardiac arrhythmias in high dosing. It's the one who's — who is — to which he was already having side effects, such as urinary retention and possible worsening of a seizure disorder. It was the one that was changed by two hospitals because they were concerned about the toxicity, but then it was returned by the correctional facility. So it is the most likely offender, the most likely to be toxic of the group. So I think it's the most likely single most important drug, and had it not been in the mix, I do not believe [Decedent] would have died that day.

(Doc. No. 60-12 at 8).

"An action or inaction need not be the sole cause of an injury to constitute a proximate cause, as there can be more than one proximate cause of an injury." *Warrick*, 2006 WL 140720, at *5. Thus, to show proximate cause, Plaintiff need establish only that Defendants' actions were a "substantial factor in producing" Decedent's injury and were "at least one of the causes without which the injury would not have occurred." *Hickerson*, Nos.95-1890, 95-1982, at *4.

The Court concludes that Plaintiff has cited to sufficient evidence from which a jury could find proximate causation as thus delineated. Plaintiff cited to evidence, such as the medical examiner's report and Dr. Allen's testimony, from which a reasonable jury could conclude that Defendants' daily provision of 200mg of nortriptyline to Decedent caused toxic levels of the drug to build up in his body and was ultimately a "substantial factor" in his death. *Hickerson*, Nos. 95-

---

[13] In their Motion, Defendants argue that Plaintiff's expert, Dr. Allen, is not a toxicologist and therefore "does not have experience giving opinions on the causes of death as a result of multi-drug toxicity." (Doc. No. 46 at 13). However, this argument necessarily invites the Court to weigh the credibility of Plaintiff's expert, Dr. Allen, which is not appropriate on a motion for summary judgment. *See Auto. Experts, Inc. v. Kallberg*, No. 3:19-CV-00982, 2021 WL 2260058, at *17 (M.D. Tenn. June 3, 2021) *(citing Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005)).

1890, 95-1982, at *4. And "[u]nless the evidence is such that a reasonable person could reach only one conclusion, proximate cause is a question of fact," which should be left to the jury. *Pierce v. United States*, 718 F.2d 825, 829 (6th Cir. 1983); *see also Barefield v. Hillman*, 475 F. Supp. 3d 794, 814 (M.D. Tenn. 2020) ("Causation is a jury question unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome."), *rev'd and remanded on other grounds*, No. 20-6002, 2021 WL 3079693 (6th Cir. July 21, 2021). Thus, Plaintiff's Eighth Amendment claim of deliberate indifference based on Decedent's nortriptyline prescription will survive Defendants' Motion.

## CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment will be **GRANTED** in part and **DENIED** in part.

Specifically, with respect to Plaintiff's Eighth Amendment Claim based on the non-provision of Keppra to Decedent, the Motion will be granted as to Defendant Leveck and denied as to Defendant Walter. As to Plaintiff's other claim, *i.e.*, the Eighth Amendment claim based on the daily administration of 200mg nortriptyline to Decedent, the Motion will be denied as to both Defendants.

An appropriate order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE